Please be seated. Thank you. Madam Clerk, please call the first case. 213-150 Dundee Township Park District v. Dillard Hill Park Museum Counsel, you may proceed. Good afternoon, Justices. Mr. Hannigan, may it please the Court, Elizabeth Capoletti on behalf of the Appellant Dundee Township Park District. This case is a relatively straightforward matter. It only concerns really one issue, penalties and fees. And I would respectfully submit to you that the Commission erred in its award of penalties pursuant to Section 19K and L and attorney's fees pursuant to Section 16. First are the 19L penalties, which are mandatory in nature unless the employer can show an adequate justification for the delay. A good and just cause for delay is defined in terms of reasonableness. Was it reasonable for the employer to believe that the delay in payment was justified? I would submit the facts in this case support the employer's reasonable basis to justify delay in payment. Now, the employer disputed payment from November 30th of 2009 through March 4th of 2010. Now, immediately prior to this time period, the claimant was under treatment and had been, in fact, seen by three different doctors. She first consulted with Dr. Levin on July 13th of 2009, and Dr. Levin discussed the possibility of effusion surgery at L5S1 and indicated that certain diagnostic tests needed to be undertaken first, a CT scan and an MI. And he released the candidate to return to work full duty as tolerated. Now, the employer exercised its right under Section 12 of the Act and scheduled an evaluation 15 days later with Dr. Lanuf. Dr. Lanuf evaluated the claimant on July 30th of 2009 and, in essence, agreed with Dr. Levin, but recommended a course of a specific type of physical therapy before the diagnostic tests were undertaken. And he also released the claimant to return to work full duty. Now, the claimant returns to Dr. Levin on August 10th of 2009, and Dr. Levin has a copy of Dr. Lanuf's July report and concurs with the recommendation of PT. He writes a script for it. The claimant undergoes the PT as recommended by both Dr. Lanuf and Dr. Levin and is continuing to work full duty as tolerated up to this point. The claimant returns to Dr. Levin on September 14th of 2009 at the completion of the physical therapy. And, again, there's the discussion regarding surgery because the physical therapy hasn't worked. It hasn't decreased her pain. So Dr. Levin recommends both the CT scan and the MRI. The CT scan is done four days later. The employee pays for it. The MRI is done 10 days later. The employer pays for it. The claimant then refers to Dr. Levin on October 5th of 2009, and all of a sudden Dr. Levin is recommending a different test, now a discogram, which he had never contemplated before. He's talking about surgery at a different level to include L-4 as well as L-5 and S-1. Did you select Dr. Singh as your Section 12 examiner? There was, I would say we scheduled the examination vis-a-vis the rehabilitation nurse because of the differences in opinion between Dr. Levin and Dr. Lanuf. And then Dr. Singh took the claim on L-4 completely as of November 30th, 2009, correct? He absolutely did take her off completely. And Levin and Lanuf, as I understand it, work releases were tendered prior to that date. Correct. Both of them had said she could continue to work in full duty. And she was, in fact, working full duty. And so when she saw Dr. Singh on November 30th, 2009, she said to the doctor, yes, I'm no longer working. Well, the reason she was no longer working was because she had been fired. I mean, she had called in sick, went to the conference. Did Singh take the claimant off work or not? Pardon me? Did Singh take the claimant off work or not? Yes, Dr. Singh did take the claimant off work as of November 30th of 2009. But two other physicians had said that she could work full duty previous to that. And those two other physicians, I mean, Dr. Singh disagreed with Dr. Levin as it related to the efficacy of a discogram as well as that release to turn to work, as did Dr. Singh disagree relative to the work status. But they're different doctors providing different opinions as their ability. And the question was, was it reasonable for us to rely on that in our delay in paying the benefits, especially in light of the fact that she was working without problems until she went to see Dr. Singh where she did tell him at that time, I'm no longer at work because she had been fired. I mean, she didn't stop working because of her lower back case or her lower back problems. So, yes, Dr. Singh certainly did take her off work, but there were two competing medical opinions saying that she could work full duty. So the question becomes, was it reasonable for the respondent to rely on those two other opinions in disputing that time period of benefits? And I would submit to you that it was reasonable for them to dispute those time periods of benefits. Dr. Singh also states, disagrees with Dr. Levin, the first initial treating physician relative to the type of surgery. So that happens on November 30th of 2009. He's now disagreeing with Dr. Levin. We have a total difference as to which type of surgery should be undertaken. We have doctors saying different things. At trial, the claimant testified that, yes, she wanted the treatment offered to her by Dr. Levin, and then she also testified, yes, she wanted the treatment offered to her by Dr. Singh. They're two totally different types of surgeries being recommended. The claimant then goes back to see Dr. Singh on February 17th of 2010, and at which point she says to Dr. Singh, I've come back here. I've chosen you as my treating physician. Two days later, the respondent authorizes the treatment in writing, saying, we will authorize the treatment as prescribed by Dr. Singh. Now, a decision has been made as to the type of surgery you're undertaking. They immediately authorized it, and they immediately began paying TTD benefits as of her date of surgery. As of March 5th of 2010, they started paying benefits. Now, a month prior to that, on February 3rd of 2010, they, in fact, also provided her with 10 weeks of benefits as a disputed basis. So, in fact, they had paid close to $3,000. They had paid almost all of their liability of the TTD benefits other than about a four-week period of time. So the question was, was the respondent acting reasonable? Was it reasonable for them to act in the manner that they worked? Was it an unreasonable delay in the benefits? And I would say no, that the facts actually indicate that they were acting very reasonably and were acting very quickly as to getting these benefits paid and doing and authorizing the treatment. Kennedy, you would agree that the burden under the statute is on the employer to justify the delay, correct? Absolutely. So that's the question is really manifest weight relative to the 19L penalties and then relative to the 19K, we have the dual standards relative to manifest weight and abusive discretion. But, yes, it is the report employer's duty to show what was the justification. And the commission found it was not reasonable, right? They said it was not reasonable, but they gave two specific reasons as to why they said that the delay in payment was not reasonable. There were two reasons. One was there was a delay in the authorization of the surgery. There was no delay. And also that conflicted with Hollywood Casino. And the second reason they gave in saying that we did not do it in a justified manner was that we violated Section 12 of the Act. And the employer did not violate Section 12 of the Act. Those were the two bases that the commission stated in saying that they were awarding the penalties, was the delay in authorization of treatment, which there was no delay, and second, that there was a violation of Section 12 of the Act. Now, Section 12 of the Act is clear and it says that within 48 hours you have to turn over the doctor's, whether it be treating or examining reports, prior to the date of hearing. And this Court recently established, I think at Mulligan, that the date of hearing is the first date of arbitration. So there's no question that the employer provided all the reports in compliance with Section 12 of the Act. Dr. Lanoff's report was initially provided to the claimant's treating physician during her August 10, 2009 visit. He clearly had the report. He refers to it. It's in his record. Thereafter, the petitioner's attorney subpoenaed Dr. Lanoff's records. I think it was on January 8th of 2010. And Dr. Lanoff provided a complete copy of the reports by January 27th of 2010. And Dr. Singh's records report was provided to the claimant by January 21st of 2010. The trial of this matter didn't proceed until March of 2011.  In fact, I mean, in reading the commission's decision, which adopted the arbitrator's decision, it seemed that they felt that the respondent or the employer was in some way trying to hide all of these reports. And that just – that's not what the facts show. I mean, the facts – So the benefits got paid at the time the arbitration hearing began, you said, in March 2011? No. The benefits were paid as March 5th, 2010. That was the date of her surgery. There were some secondary benefits that happened relative to April of 2010, and then from November of 2010 through March of 2011. There was another point of benefits relative – and there was no late fees, or the commission didn't award 19-L penalties relative to that second time. They were very specific, and they only awarded them relative to the first time in 2009 through 2010. Now, there was a second time of benefits because there was a difference in opinion as to a need for a second surgery. Dr. Singh did the first surgery. We immediately started paying benefits as of March 5th of 2010. She continued to treat with Dr. Singh. She continued to have some problems. Dr. Singh recommended a second revision surgery based upon a CT scan that he performed. So the commission did award $10,000 in penalties under Section 19-L, correct? Correct. Relative to the first period of time. And they were very specific in their decision that that late fee was levied for that period of time relative to November 30th. You have an issue with that. Pardon me? You have an issue with that. Yes, I have an issue for that. 267 days by a simple calculation passed between the date Dr. Singh took the claimant off work and the arbitration hearing began, correct? Correct. And you see no problem with that. Well, I mean, I have a problem with the late fees in general under Section 19-L. You're asking me the statutory interpretation as to whether or not that time period can be calculated as to the date it's due or not. Yes. Well, my reading of the statute, the plain reading of the language of the statute, and especially in conjunction with the way that the commission worded its decision, that it was very specific that they were only awarding it for this period of time, I believe that it's in conflict with the plain reading of the statute relative to how the commission then worded their decision. I mean, I understand that there is a decision. What you're talking about is the language where they say, and I had it just a second ago, 19-L. Notice, because respondents failed to pay TTD for the period November 3, 2009, through March 5, 2010, was unreasonable. Correct. Correct. You do read that as they're saying those are the days of their account. Correct. Why wouldn't they just be saying, fair to pay for that period then and after was unreasonable? Why wouldn't you read it that way? Well, I didn't read it that way because they were very specific in defining that specific period of time. They were defining the period of TTD that wasn't paid then or after, for which they were imposing penalties, right? You can't read it that way. You could read it that way. I mean, I understand what you're saying, but I think then if you read it. Because you're talking about they were so specific about it that I read it. They're talking about they're not saying they're awarding penalties just for that period. They're saying that's the period of TTD that they're awarding penalties for, the failure to pay for that period. And the failure to pay went on longer, right? Well, absolutely, because it continued on to appeal and everything else. So then the question becomes then you look at the statute and we're back. The language for 19L is different than the language for 19K when we're talking about an amount payable at the time of their due, right? I mean, so there's been a lot of case law out there about the amount payable, and it's for the full amount payable relative to each benefit awarded, TTD versus medical versus PPD. I mean, there's no question. I don't think I could argue before this Court with a straight face that this hasn't been decided relative to 19K penalties because of the language of the amount payable. I'm saying that I'm reading the commission's decision relative to 19L and that very specific thing in a different way relative to the statutory language for the late fee because it is a mandatory penalty. And it's a different penalty. It's just it's not as egregious as the 19K penalties. And if you just read the statute, you could potentially have an absurd result. So say I go to trial and I inadvertently delay payment. I mean, there's no question because there's also a 14-day rebuttable presumption that I haven't paid and there's been a written demand that that's unreasonable. So it's clearly inadvertent, but is there real, you know, it's an inadvertent delay of payment. Then I can be leveled for a $10,000 penalty for a one-day miss. And I guess what I'm saying is that's not the way I read that statute, especially in conjunction with the way the commission wrote their decision. Because that's what this, if you interpret it that way, that's what the statute says. You can miss one day. And if it takes that long to get through the process, then I can be levied with a $10,000 penalty for missing one day. I mean, shouldn't employers be paying attention to whether they owe TTD or not? I mean, it's a burden on the employer to show it was reasonable not to pay. Sure. But that's just forgetting. Can we say, oh, it's okay to just forget? No, but it might not just be, I mean, I use forgetting. But there could be another way because of a miscalculation at the time, let's say, relative to the three days where you don't pay and then you have to start paying for the 14 days. And when, you know, when does that calculation begin? Because there is some, there could be some divergence about that. So then would that be, you know, a delay in payment? Absolutely. It could just be a delay in payment that's not determined until later on. That might not be, the scenario you just gave might not be an unreasonable delay. I mean, if that's the proof is that, you know, it's an inadvertent mistake or whatever. Right. But it might, I mean, the commission might consider it a reasonable delay because there's already the rebuttable presumption that it's unreasonable. After 14 days. And I guess in construing the statute of such a way, you come to a result where there is a day where you can miss one day and still end up being levied a $10,000 fee. Theoretically, but that didn't happen. Theoretically. No, not here. And that's, I mean, what I was trying to talk about here is relative to these facts that we continue to actually make payments at all times. This wasn't a case where the Respondent just threw up their hands and didn't pay. I mean, every time after the November 30th, as soon as she went off to work with Dr. Singh, we paid the benefits. We paid them all the way through. And then that second period of time, which is what we were talking about relative to November of 2010 through March of 2011, there were conflicting medical opinions again. There was Dr. Singh who said, yes, she needs more treatment. Yes, she is off of work. Yes, I think she has pseudoarthritis. And there was Dr. Colavo who looked at surveillance videotape that was taken on September 1st and September 2nd showing the claimant basically doing her job duties. He reviewed that surveillance tape along with the diagnostic test and came up with a different opinion. He said, no, she can return to work full duty. She doesn't need any more treatment. But even so, the Commission still awarded the penalties. They didn't find any late fees for that, but they said it was unreasonable for us to pay, not be paying during that period of time where there was, in fact, two different doctors having two different opinions. I mean, I think Avon Products is pretty clear that these were reasonable doctors. They disagreed. And we didn't stop paying as soon as we got the surveillance video. I mean, we didn't. We continued to pay. And we went and obtained a Section 12 evaluating physician to look at the videotape, to evaluate her. And it was only at that juncture that we stopped paying and we stopped disputing it. Counsel, you have time on the fly. Thank you. Good afternoon, Justices. My name is Richard Hannigan. I represent Jessica Boston Gale. There has never been a dispute that this 22-year-old sustained her first injury March 4th, 2008, which the Commission and the arbitrator found caused the need for a fusion, TTD, and a second fusion. She had an aggravation for which we filed on May 11th, 2009, and the Commission found that that wasn't the culprit. After May 11th, 2009, she had physical therapy at Sherman Benefit Manager, failed to improve, and she was seen by Dr. Levin on July 13th, 2009. Dr. Levin then sent a letter to the adjuster and the nurse case manager, who has been with the petitioner for every visit, stating that this woman needs an L5-S1 fusion. She will not have a spontaneous resolution of her pain without the surgery. She will require a CAT scan and an MRI to better evaluate the neighboring discs. He found that she had pain and the need for treatment was directly related to the work injury. He indicated that she could work as tolerated. A medical nurse case manager got the petitioner into a Section 12 examination with Dr. Lanoff almost immediately. She saw Dr. Lanoff on July 30th, 2009, and Lanoff stated, and I quote, Dr. Levin's assessment is right on target with just about everything he said. I cannot blame him for recommending surgical intervention at this point because she has failed physical therapy twice. Dr. Lanoff then goes on to recommend, however, a different course of therapy. He doesn't discuss anything with the injured worker. He sends this stuff to the adjuster and the nurse and the nurse gives it to Dr. Levin and Dr. Levin doesn't discuss anything about Dr. Lanoff's report with this injured worker but says we're going to try a different course of physical therapy. They try that different course of physical therapy and it doesn't work. So on September 14th, 2009, Dr. Levin then again recommends the L5-S1 fusion. The record indicates that the patient said, I just want to get rid of the pain. I want the fusion. The nurse case manager then sent the injured worker right back to Dr. Lanoff and on November 3rd, 2009, Dr. Lanoff agreed that she should have an L5-S1 fusion but not a discogram. Now, did she end up going back to Dr. Levin with that note? No. The nurse case manager told this 22-year-old, Levin's too expensive. We're going to send you over to Dr. Singh for an opinion. Now, Lanoff never gave the petitioner his Section 12 report, first one or the second one. Dr. Levin never had the opportunity of reviewing Dr. Lanoff's second report and determining whether that was necessary or not. But we know that those two doctors said she needs a fusion at L4, L5-S1. Now, I submit to you that under Section 12 it says the doctor is obligated to send that report to the employee if a physician is not present, there was none present. And it says as soon as practicable. It doesn't say send it to the doctor. It doesn't say send it to an attorney. It says that physician is to send it as soon as practicable. And quite honestly, Justices, I disagree with this interpretation that the 48-hour rule is a default rule, that all you have to do is present this documentation 48 hours before trial and it's a get-out-of-jail-free card. If we're going to look at the language that precedes it, it either means something and it says it's the physician's obligation or it doesn't mean a thing and we might as well strike it from the act. What does that have to do with the application of penalties? I don't believe that the penalties are necessarily rewarded for their failure to do that. I think what the commission is saying, this is part of the bad faith on the part of the adjuster in the insurance company. They're not following the Workers' Compensation Act. So they aren't acting in good faith. However, when we get down to it, they didn't pay November 30th to March 5th. They did an advance of 10 weeks of PPD. When Dr. Singh released her with restrictions beginning April 1st, they sent her a nasty gram cutting her off April 1st and not until April 28th did Dr. Singh take her off of work again. They never sent her a copy of Dr. Singh's November 30th report that said she shouldn't be working, that said she should have that L5-S1 fusion. For this insurance company, Jessica Boston Gale ceased to exist. Until she came to my office, I filed an application for adjustment of claim and in January subpoenaed these doctors who I'm well familiar with, who then I read reports that said this person needs to be off work, this person needs a fusion, and they did nothing. Well, that takes care of a lot of pages. It was a very extensive summary. It just, it's mind-boggling for me. Now, counsel has said that they advanced 10 weeks. They advanced 10 weeks at the PPD rate. On February 5th, we received those 10 weeks, but at the lower rate. They didn't send another check until March 31st, 2010. They paid March 5th, 2010 to March 18th. They then issued a second check March 31st, 2010, but cut her off of TTD because she was under restrictions with Dr. Singh, even though she had not been discharged, and even though I sent them a letter regarding interstate scaffolding in January. So if we use the April date, and they never paid any TTD from April 1st to April 27th. Now, that isn't mentioned in the commission decision, but please note that's 343 days that they didn't pay her. And when we do the math, we know that it's nine and one-seventh weeks of benefits that were not paid. So they then, we get to the point of November 23rd, 2010, where they cut her off again. They have a third different Section 12 doctor evaluate her and issue the fourth Section 12 report. He reviews a surveillance tape of her pulling weeds in a yard in preparation for her sister's wedding. Now, fortunately for the petitioner, just days before that, she had a functional capacity evaluation with a job description provided by the employer that said that she couldn't do that work. Yet Dr. Colavo, who says it's a valid FCE, opines that based upon what he saw, she could go back to work full duty. He didn't consider Dr. Singh's records. He didn't even know about Lanoff or Dr. Levin. And the commission noted that he didn't really have any credibility. So to say that they engaged in doctor shopping, I think the commission found that to be an understatement. They found it to be, to lack credibility. If Singh was suitable for a Section 12 examination with them as the third examination, why didn't they just do what, you know, go by his recommendation when we did his deposition and showed him those films? Why didn't they just send the film? You know, unless I'm missing something, this whole appeal is about penalties. That's correct. What are you talking about? Well, it's all about bad faith. No, no, no. It's about whether they had any reasonable basis not to pay TTD for the period of November 30th to March the 5th. Singh was the only one that had given an opinion. He was their expert. He took her off work on November the 30th. Singh's opinion was the only opinion they had legitimately from that period of time. That's 96 days. They delayed the payment for over 400 days thereafter. The question becomes were you entitled to the $10,000 for the 19L and was there a vexatious refusal to pay TTD benefits for that period of time when the only opinion was she couldn't work, unreasonable, or did they fail to prove that it was reasonable? What is all this business about no reports from this examiner, that examiner, the other examiner? It's like putting mud in the water. And I respectfully disagree. I also disagree in that Dr. Levin testified or his records showed that she could work as tolerated. She stated and testified without contradiction that she didn't do any of the heavy lifting, and at the end of those days she paid for it with increased pain. And the arbitrator and the commission noted that. I just threw you a softball. I'm sorry. I gave you your whole case. November 30th, Singh says she's off work completely. No one says she can work between November 30th and March 5th. If no one says she can work, is she entitled to TTD? Yes. Okay, that's 96 days. They don't pay her those 96 days, and then they delay it for 467 days more. Correct. Before they pay her the money. Correct. Now, is she entitled to the $10,000 because they delayed for 467 days, which would have been $14,000, and the statute says the maximum is 10, and is their refusal to pay TTD for this period of time unreasonable, unless they can show that some doctor said she could work between November 30th and March 5th, they've got a problem on their hands. That's correct. That should be your answer, yes. I'm sick of listening to reports of all sorts. I thought we were in a different case. Your time is up. Thank God. At least you read it on a high note. Counsel may reply. Who said she could work from November 30th to March 5th, 2010? Well, both Dr. Levin and Dr. Lanoff said she could work prior to that. Before the 5th. Before Singh's report. Right. Correct. And there's no reason to believe that there was a need. I mean, also Dr. Levin said that she needed a fusion surgery at L4 through S1, and Dr. Singh disagreed with that. Really, except for one problem. Singh was your doctor. He's your guy. Your guy says she can't work. All right. Do you think in the face of that you can withhold TTD from an injured employee? Really? Well, one, I would disagree with your qualifications of him being R.I., because I think that there was a legitimate dispute as to what type of surgery she needed to be. Who hired her? Who hired her? For that one exam we did. You know, there's a famous case called Sears v. Rutenhauser where a judge from the 2nd District wrote an interesting article. He said the handling of an expert witness can be summed up in the adage of the old sage, whose bread I eat is whose song I sing. And this man was hired by you, and he told you she couldn't work. How can he not pay you the benefits? Well, Dr. Lanoff was also hired by us, and he said she could work. I mean, so, I mean, by that, using that logic, so Dr. Lanoff, who we hired as well, said she could work full TTD. Don't you have to err on the side of payment of benefits as opposed to erring on the side of we're going to keep the money until they force us to pay the benefits? And I think they did err on that side shown by the fact that they did, in fact, make an advance that covered almost all of the benefits except for four weeks. I think that's exactly what they did. They did err on that side. I mean, I appreciate what you're saying, Judge, and I understand, but I think that there was a legitimate dispute between doctors as to whether or not she could work, and they weren't unreasonable. Let me ask a question. Sure. Calculation. Sure. The statute does say sum up $30 per day for each day that the benefits are withheld. Okay, so for day one, there's a 30-day penalty on day two. Right. Then when you get to day three, it's a $60 penalty because there's 30 for day one and 30 for day two, right? Sure. Then on day four, it's 90. I understand your interpretation. I understand what you're saying. You count each day, right? So this is an escalating thing. You don't take 96 days times 30, right? Well, I would argue that you would take 96 days, but I understand what your interpretation is. Remember, it would be $30 per day for each day that is withheld if you go 96 without paying. I mean, do you agree with me here? I understand what you're saying. I do understand what you're saying. I guess my interpretation, just reading the literal statute, is different, especially in light of the fact that it is worded in a different way than 19K, which talks about amount payable. I guess I'm reading them in a different way. Yeah, you say in your brief it can't be $10,000 in penalties because 96 days times 30 equals a penalty of $22,880. But you're only taking like one day of it being withheld for 96 days. But what about the other 95? Right, I understand what you're saying. No, I understand what you're saying. I understand the way you're interpreting it. Okay. Thank you. Thank you, counsel. Both this matter will be taken under advisement. A written disposition shall issue.